IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


NATIONWIDE INSURANCE          :          CIVIL ACTION
INDEPENDENT CONTRACTORS        :
ASSOCIATION, INC., et al.      :
                              :
        v.                    :
                              :
NATIONWIDE MUTUAL INSURANCE    :
COMPANY                        :          NO. 11-3085


MEMORANDUM

McLaughlin, J.                                April 30, 2012

        On October 4, 2011, the Court dismissed a complaint

brought by the Nationwide Insurance Independent Contractors

Association, Inc. ("NIICA") against Nationwide Mutual Insurance

Company for lack of associational standing.  NIICA and NIICA

member David A. Gardner filed an Amended Complaint on November 7,

2011, alleging many of the same underlying facts.  The defendant

filed a motion to dismiss the amended complaint.  The Court will

grant the defendant's motion.


I.    Facts as Alleged in the Amended Complaint

        NIICA is a non-profit voluntary-membership organization

of agents affiliated with the defendant.  It is "operated for the

purpose of protecting the professional interests of its members

and improving their working conditions."  Am. Compl. ¶ 10.  The

association's purpose is to act on behalf of its members as "a

watch dog insuring that the corporate does not take advantage of

its sales force." Id. ¶ 11.  The NIICA Board of Directors determined that this suit would not harm any of its members and NIICA did not receive any objection to this lawsuit from its Pennsylvania members.  Id. ¶ 16.

Gardner is an agent in an independent contractor relationship with Nationwide.  In 1991, he signed an Agent's Agreement with Nationwide, known as the 1987 Agreement.  Id. ¶ 2, Ex. B.  All NIICA members operate under similar agent agreements. Id. ¶ 12.

Prior to 2004, Nationwide agents either automatically accumulated deferred compensation incentive credits ("DCIC") based on their annual earnings or enrolled in an alternate compensation program which lacked deferred income credits but gave higher levels of current compensation and benefits.  Id. ¶¶ 37, 39.  In 2004, Nationwide introduced a new agent agreement that eliminated deferred income credits for new employees.  Id. ¶ 39.  In 2006, Nationwide introduced the "On Your Side Promise" which gave Nationwide increased supervisory powers over those agents who agreed to participate in the program.  Id. ¶ 41.  In 2009, Nationwide replaced all earlier non-DCIC programs with the "2010 Agent Choice Addendum."  Agents who sign the 2010 Addendum waive their right to accrue additional DCIC, although they retain DCIC already accrued.  Id. ¶¶ 45-46.  Gardner did not sign the On Your Side Promise or the 2010 Addendum.  Id. ¶ 47.

Gardner's agent agreement contains a provision stating that the agent will not solicit or write policies of insurance in

companies other than Nationwide without Nationwide's consent.
With Nationwide's consent, individual agents can broker business
through, for example, Insurance Intermediaries, Inc. ("III"), a
Nationwide-owned brokerage company for non-Nationwide insurers.
Id. ¶¶ 27-29.

The 2010 Agent Addendum also includes a provision that
gives Nationwide exclusive and permanent ownership and control
over all policyholder information developed by the agent and
transmitted to Nationwide.  Id. ¶ 66.  In addition, Nationwide
issued a 2009 Nationwide Agency Administration Handbook, which
says that failure to turn over confidential information,
including policyholder information, upon termination of a
contract with Nationwide, constitutes grounds for forfeiture of
agent's post-termination payments.  Id. ¶¶ 30, 33, 81.
Nationwide has also asserted "in litigations and elsewhere" that
policyholder information is its trade secret. Id. ¶ 51.

II.  The Plaintiffs' Claims

The plaintiffs allege that the 2010 Addendum and the
2006 On Your Side Promise constitute discrimination against those
employees with pre-2004 agent agreements who choose not to
relinquish their DCIC benefits.  Id. ¶¶ 52-59.

The plaintiffs also allege that Nationwide is
"arbitrarily denying access to the III network to Mr. Gardner and
other agents like him" who have opted to retain their DCIC
benefits and not enroll in the new compensation system.  Id. ¶

48.  The plaintiffs also claim that Nationwide is withholding bonus compensation from Gardner and other agents in order to pressure them to sign the On Your Side Promise agreement.  Id. ¶¶ 60, 61.  The plaintiffs claim that Nationwide has breached the agency agreements or the implied covenant of good faith and fair dealing by discriminating against Gardner and similarly-situated agents who do not relinquish DCIC benefits and pressuring those agents to relinquish those benefits.  Id. Count I, II.

In addition, the plaintiffs seek a declaration that Nationwide's attempt to control policyholder information breaches Gardner's agency agreement and the agent agreements of those agents who have not signed the 2010 Agent Choice Addendum.  Id. ¶¶ 69-74, Counts III-V.

III. Analysis

The defendant filed this motion to dismiss arguing that NIICA and Gardner lack standing to pursue their claims and that Gardner fails to state a claim.

A.   Standing

An association has the right to bring a lawsuit on behalf of its members even when the association itself has not suffered any direct injury.  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342 (1977).  To demonstrate standing, an association must show: 1) its members would otherwise have standing to sue in their own right; 2) the interests it seeks to protect are germane to the organization's purpose; and 3) neither

4

the claim asserted nor the relief requested requires the
participation of individual members of the organization.  Id. at
343.  A plaintiff seeking jurisdiction in federal court has the
burden of showing that it has standing for each type of relief
sought.  Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).

        The first Hunt prong requires that the association show
that its members would otherwise have standing to pursue a claim
in their own right.  Hunt, 432 U.S. at 343.  A plaintiff
organization must make specific allegations that at least one
identified member has standing.  Summers, 555 U.S. at 498.  In
order to have standing, a plaintiff must show that he has
suffered an "injury in fact" which is "concrete and
particularized . . . actual and imminent, not conjectural or
hypothetical," that the injury is fairly traceable to the
defendant's action, and a favorable decision is likely to redress
the injury.  Summers, 555 U.S. at 493; Lujan v. Defenders of
Wildlife, 504 U.S. 555, 560 (1992).  An injury is "concrete" if
it is "distinct and palpable, as opposed to merely abstract."
N.J. Physicians, Inc. v. President of the United States, 653 F.3d
234, 238 (3d Cir. 2011) (internal quotations omitted). Imminence
requires "that the plaintiff demonstrate a realistic danger of
sustaining a direct injury."  Id.  Without an allegation that a
specific member of the association has standing, the case must be
dismissed for lack of associational standing.  Pa. Prison Soc'y
v. Cortes, 622 F.3d 215, 228 (3d Cir. 2010).

     1.  <u>New Compensation Agreements</u>

NIICA does not have standing to challenge the 2010 Choice Addendum or the On Your Side Promise because NIICA does not allege that at least one NIICA member has standing to pursue this claim.  Gardner is not a party to either of these agreements, and therefore does not have standing to challenge them.  In addition, Gardner does not allege any injuries-in-fact as a result of the existence or implementation of these programs.[1]  At most, the plaintiffs seem to object to those agents who participate in the agreements receiving benefits which are not available to those who do not participate.

NIICA has also failed to address the potential conflict of interest among its members based on this claim of discrimination.  When there are genuine conflicts of interest among members of the organization, that counsels against finding standing.  <u>Amato v. Wilentz</u>, 952 F.2d 742, 750 (3d Cir. 1991).  NIICA has not alleged that a majority of its members are harmed by the 2010 Addendum or the On Your Side Promise, or addressed whether some (or many) of its members may benefit from these

---

[1]In its original complaint, NIICA alleged that the On Your Side Promise plan discriminated by offering bonuses, which were originally meant to be performance-based, to those employees who submitted to these new corporate controls, but not those who refused.  Compl. ¶¶ 46, 63-64.  In response to the first motion to dismiss, Gardner also submitted an affidavit explaining that the 2010 Addendum provided different commission rates and service fees to those who had relinquished DCIC benefits and those who had not.  Gardner Decl. 7/10/11 ¶ 5.  Now the plaintiffs do not explain how the existence of the plan itself is a breach of non-signatories' contracts.

agreements.  NIICA relies upon the argument that individual Nationwide agents do not compete against one another, and that no NIICA member has objected to this suit, arguments which do not address this concern.  NIICA also attempts to remedy this deficiency by claiming to bring suit on behalf of only its members who did not enter the agreements, and thus are harmed by the "discriminatory" treatment.

NIICA's attempt to bring suit on behalf of only its members who did not enter the agreements is unavailing.  The test of associational standing is to determine if the association as a whole can bring suit because it is in the interest of the majority of its members.  Hosp. Council of W. Pa. v. Pittsburgh, 949 F.2d 83, 88-89 (3d Cir. 1991).  NIICA cannot carve its membership into groups to avoid this analysis.

### 2.   Policyholder Information

NIICA has likewise not shown that any association member has standing to challenge Nationwide's claimed ownership of policyholder information.  Gardner alleges that he has been harmed because:

> Nationwide's practice of asserting that it has exclusive ownership, use, and control of all of the policyholder information in my book of business is damaging me and any other agent who needs to secure independent financing of his/her business.  The goodwill and going concern value of my business is made up entirely of the documented book of business that I have developed, which I maintain in separate paper and computerized files.  If I need to secure financing or show credit worthiness, that is the asset that I have to rely on.

Gardner Decl. ¶ 7.

Gardner does not allege that he has sought and been denied financing on this basis.  He alleges that his present harm is based on the fact that: "I know that I cannot obtain independent financing when I cannot warrant to a bank that my business is my own."  Pl. Resp. 8.

This injury is not concrete, particularized, or actual. Gardner claims that if he wanted to obtain financing, he believes he would be unable to do so.  This injury is based on speculation.  Gardner does not allege that he has attempted to obtain financing.  Gardner also alleges that he is presently injured by knowing that he cannot obtain financing.  This injury is not sufficiently concrete.  There is no allegation that Gardner needs to obtain financing or has been injured by his inability to do so.  Instead, he alleges that he is injured because if he were to attempt to obtain financing, he believes he would be unable to do so.  "Some day intentions--without any description of concrete plans, or indeed even any specification of when the some day will be--do not support a finding of the actual or imminent injury that our cases require."  Summers, 555 U.S. at 496 (internal quotations omitted).  Gardner's claimed harm is not the sort of concrete injury necessary to show that "the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction."  Id. at 493 (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).

3.   <u>Coercion of Agents</u>

Finally, on the claim that the defendant has a policy of coercing agents to relinquish DCIC benefits by withholding bonus payments and network access, NIICA has likewise failed to meet the <u>Hunt</u> test.  To the extent that this claim is an expansion of the plaintiffs' "discrimination" argument, that some agents who sign the new compensation agreements receive benefits not available to those who do not sign those agreements, the same concerns raised above on the first and second <u>Hunt</u> prongs apply. In addition, the third <u>Hunt</u> factor is not met.

To prove associational standing, the plaintiff must show that the claim does not require the individual participation of the organization's members.  At the motion to dismiss stage, a plaintiff does not need to plead that absolutely no individual participation will be necessary.  Particularly when seeking declaratory relief, a plaintiff's assertion that it can prove its allegations without individual participation can be enough, if it seems that the challenge is to the defendant's "methods" or "practices."  <u>Pa. Psychiatric Soc'y v. Green Spring Health Servs. Inc.</u>, 280 F.3d 278, 286-87 (3d Cir. 2002); <u>Hosp. Council of W. Pa.</u>, 949 F.2d at 89-90.

Here, the plaintiffs do not allege that they can prove this claim without considering whether each individual agent has been denied bonuses or access to non-Nationwide networks.  Their participation would be required to determine liability and grant relief, and the Court would need to consider individual agents'

contracts with Nationwide and Nationwide's behavior towards each of those agents, even if a practice of wrongdoing was alleged. The plaintiffs rely on the same statement that was previously rejected by the Court alleging "that the claims asserted and the relief requested . . . do not require the participation of individual members of NIICA or an examination of the particular facts of any member's situation." Am. Compl. ¶ 19. Standing alone, this conclusory allegation does not meet the third <u>Hunt</u> factor. The plaintiffs have not shown that NIICA could litigate this claim without the participation of individual members.

B.    <u>Failure to State a Claim</u>

The defendant also argues that to the extent he has standing, Gardner fails to state a claim upon which relief can be granted. The Court has already concluded that Gardner lacks standing to generally challenge the new compensation agreements or to challenge Nationwide's claimed ownership of policyholder information. Therefore the Court only considers Gardner's claim that Nationwide has denied him a bonus and access to non-Nationwide networks to which he is entitled.

In evaluating a motion to dismiss under Rule 12(b)(6), district courts must undertake a two-part analysis. <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). First, the court should disregard any "legal conclusions." <u>Fowler</u>, 578 F.3d at 210-11. Then, accepting all well-pleaded facts as true and construing the

complaint in the light most favorable to the plaintiff, the court should determine whether the facts alleged are sufficient to show that the plaintiff has a "plausible claim for relief."  <u>Iqbal</u>, 556 U.S. at 679.  The "complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."  <u>Fowler</u>, 578 F.3d at 211.

Gardner alleges that the defendant has breached its contract with him and that the defendant has breached the implied covenant of good faith and fair dealing by withholding a bonus and denying him access to the III network.  Am. Compl. ¶¶ 58, 62.

### 1. Applicable Law

Pennsylvania law requires a plaintiff claiming a breach of contract to plead three elements: "(1) the existence of a contract, including its essential terms, (2) breach of a duty imposed by the contract[,] and (3) resultant damages."  <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 225 (3d Cir. 2003) (quoting <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).[2]

---

[2] The defendant argues that Ohio law should apply here.  The plaintiffs argue that Pennsylvania law applies.  A federal court sitting in a diversity action applies the choice-of-law analysis of the forum state in which it sits, in this case, Pennsylvania. <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941); <u>Hammersmith v. TIG Ins. Co.</u>, 480 F.3d 220, 226 (3d Cir. 2007).
When there is no explicit or implicit choice of law among the parties, as is the case here, Pennsylvania choice-of-law determinations proceed in three steps.  First, the court must consider the laws of the relevant forum states in order to determine "if there is an <u>actual</u> or real conflict between the potentially applicable laws."  <u>Hammersmith</u>, 480 F.3d at 230
Neither party identifies a conflict between Pennsylvania and Ohio

In Pennsylvania, there is "considerable disagreement over the applicability of the implied duty of good faith." <u>Ash v. Cont'l Ins. Co.</u>, 932 A.2d 877, 533 n.2 (Pa. 2007).  Many Pennsylvania courts apply section 205 of the Restatement of Contracts, holding that "[e]very contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement."  Restatement (Second) of Contracts § 205; <u>see also Kamco Indus. Sales, Inc. v. Lovejoy, Inc.</u>, 779 F. Supp. 2d 416 (E.D. Pa. 2011) (collecting cases).

The parties do not dispute that section 205 applies to this contract.  Thus the Court can "utiliz[e] the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action" so long as the "duty is not divorced from the specific clauses of the contract and cannot [be] used to override an express contractual term."  <u>Northview Motors, Inc. v. Chrysler Motors Corp.</u>, 227 F.3d 78, 91 (3d Cir. 2000).

But the plaintiffs also argue that Pennsylvania law recognizes a cause of action based on an obligation of good faith and fair dealing independent of any contractual provision.  In several cases, Pennsylvania courts and courts applying Pennsylvania law have specifically held otherwise.  <u>See JHE, Inc. v. SEPTA</u>, No. 1790, 2002 WL 1018941, at *5 (Pa. Ct. Comm. Pl. May 17, 2000) ("[T]he implied covenant of good faith does not allow

---

law on these claims.  Because there is no identifiable conflict between the laws, the Court applies Pennsylvania law.

for a claim separate and distinct from a breach of contract claim. . . . [T]he covenant does nothing more than imply certain obligations into the contract itself."); Mercy Health Sys. of Se. Pa. v. Metro. Partners Realty LLC, No. 3046, 2003 WL 21904583, at *2 (Pa. Ct. Comm. Pl. July 10, 2003) ("[E]very contract imposes the duty of good faith and fair dealing; however, the Court finds that an alleged breach of this implied duty does not provide an independent ground for liability."); Northview Motors, 227 F.3d at 91-92 ("[I]f a plaintiff alleging a violation fo the implied covenant of good faith also were to file a claim for fraud based on the same set of facts, Pennsylvania courts likely would decline to proceed with the claim alleging bad faith."); Sheinman Provisions, Inc. v. Nat'l Deli, LLC, No. 08-453, 2008 WL 2758029, at *3 (E.D. Pa. July 15, 2008) ("[A] plaintiff must allege facts to establish that a contract exists [and] . . . that defendant failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract.").

To support their claim, the plaintiffs rely on Kamco Industries. 779 F. Supp. 2d 416. In that case, a plaintiff contracted to be an authorized retailer on behalf of the defendant. Under the contract, the plaintiff would receive commissions for all sales he made, except for several "house accounts" which were handled by the defendant's in-house sales employees. The contract gave the defendant the "right to redefine these [house] accounts." Id. at 418. The agreement specified that it lasted for one-year terms unless either party

provided notice sixty days before the yearly expiration.  The
defendant attempted to terminate the contract shortly after a new
term had begun.  When the plaintiff refused to agree to early
termination, the defendant re-categorized nearly all of the
plaintiff's accounts as house accounts, effectively terminating
all payments it was obligated to make to the plaintiff.  Id. at
421-22.

The court rejected the defendant's argument that "a
plaintiff can only assert a claim for breach of the implied
covenant of good faith and fair dealing by establishing that the
defendant breached a specific duty imposed by the contract other
than the covenant of good faith and fair dealing."  779 F. Supp.
2d at 426 n.7.  The court found that the defendant violated the
contract by attempting to circumvent the termination provision
through the house accounts definition.  The court's analysis of
the plaintiff's claim focused on the intent of the parties
regarding the house accounts and the process of terminating the
contract.  The plaintiff was not alleging a generalized violation
of the covenant of good faith, but instead alleging that the
defendants violated the covenant inherent in the performance of a
specific provision of the contract.

To the extent that the plaintiffs' claims are based on
a free-standing obligation of the defendant to act in good faith
solely because a contract exists, the Court concludes that
Pennsylvania law does not recognize such a claim.  "[A] federal

court in diversity should be reluctant to expand state common law." Northview Motors, 227 F.3d at 92 n.7.

Thus the Court considers Gardner's breach of contract claims.

### 2.   Gardner's Claims

Gardner does not plead the existence of any contract provision which entitles him to a bonus payment.  Thus, he does not state the first element of a claim for a breach of contract on that claim.  Ware, 322 F.3d at 225.

On his claim that he has been denied access to the III network, Gardner's claim begins with paragraph 4 of his agent agreement with Nationwide:

> It is agreed and understood that you [Gardner] will represent us exclusively in the sale and service of insurance.  Such exclusive representation shall mean that you will not solicit or write policies of insurance in companies other than those parties to this Agreement, either directly or indirectly, without the written consent of these Companies [Nationwide].

See Compl., Ex. A, ¶ 4.  This agreement unambiguously restricts Gardner's ability to write policies with companies other than Nationwide "without the written consent" of the defendant.

The plaintiffs allege that "Nationwide is arbitrarily denying access to the network to Mr. Gardner and other agents like him who need to keep their ongoing retirement benefits." Am. Compl. ¶ 48.  Gardner alleges that without Nationwide's consent, he cannot provide service to customers who want insurance policies the defendant does not provide and thus cannot

provide the best possible service to the customer or maintain a growing agency.

Breach of the obligation of good faith includes "evasion of the spirit of the bargain, lack of diligence and slacking off, . . . abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992). Implied good faith duties are used to "harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." Kamco, 779 F. Supp. 2d at 426. The good faith obligation cannot be used to "override an express contractual term" of the agent agreement. Northview Motors, 277 F.3d at 91.

Paragraph four of Gardner's agent agreement with Nationwide gives the defendant the sole discretion to consent to network access. Gardner does not allege that he has sought to use the network, or that he has been denied the ability to do so. He likewise does not allege any facts to support his claim that network access is tied to relinquishment of retirement benefits. Thus the plaintiffs do not plead any facts to show that Nationwide is breaching its obligation of fair dealing under the contract by withholding its consent for Gardner to access the network for arbitrary or coercive reasons. The plaintiffs' allegation is not sufficient to state a plausible claim for relief.

III. <u>Dismissal</u>

When a complaint is dismissed, the Court must "permit a curative amendment, unless an amendment would be inequitable or futile." <u>Phillips v. Cnty of Allegheny</u>, 515 F.3d 224, 236 (3d Cir. 2008). NIICA was permitted to file an amended complaint following this Court's conclusion that the original complaint failed to plead the elements of associational standing. The defendants have now filed two successful motions to dismiss on similar grounds in this Court.[3] Because the plaintiffs were unable to remedy this deficiency, and have not explained how they could adequately plead their claims, the Court concludes that allowing the plaintiffs to amend again would be futile. The plaintiffs' complaint will be dismissed with prejudice.

An appropriate order will issue.

---

[3] NIICA has also filed two similar suits against the defendant in the Western District of Texas and the Southern District of New York. <u>See</u> Compl., <u>NIICA v. Nationwide Insur. Co.</u>, 11-3172 (S.D.N.Y. May 11, 2011); Compl., <u>NIICA v. Nationwide Mut. Insur. Co.</u>, 11-450 (W.D. Tex. May 27, 2011).